to make pecuniary compensation for her sufferings.

It is therefore ordered that the judgment appealed from be set aside, and that there now be judgment in favor of the plaintiff John W. Schernbeck, for the use and benefit of the minor, Clara Bell Schernbeck, in the sum of $500, with legal interest from the date of this judgment until paid and all costs.

(73 South. 774)

No. 21044.

BLANCO v. NEW ORLEANS RY. & LIGHT CO.

(Jan. 15, 1917.)

*(Syllabus by the Court.)*

1. CARRIERS ⊜�longrightarrow327—PERSONAL INJURY—ATTEMPT TO CATCH CAR—CONTRIBUTORY NEGLIGENCE.

Where, at a moment when he is preoccupied with an impulse to catch a street car upon one of two adjacent tracks, a person precipitates himself against or in front of a moving car upon the intervening track, under circumstances which preclude the possibility of averting the injury which he thereby sustains, he has no just claim on that account against the company operating the car.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1363–1366; Dec. Dig. ⊜⟶327.]

2. CARRIERS ⊜⟶287(9) — PERSONAL INJURY — OPERATION—ORDINANCE.

The city ordinance which requires that on double-track streets, where an electric car has stopped to let off or take on passengers, a car, headed in the opposite direction on the other track, must halt 30 feet from the stopped car long enough to permit the passengers who alight therefrom to cross the track of such halted car, should they so desire, is intended as a measure of protection for the passenger who alights from a car on one of two adjacent tracks, and, passing behind it, to cross the other track, incurs the danger of being injured by a car moving in the other direction on such track, and which remains masked by the car from which he has alighted until he, perhaps, finds himself immediately in front of or underneath it. There is, however, nothing in the ordinance which indicates any purpose to legislate for the protection of persons who approach a street car for the purpose of taking passage on it by crossing an intervening track, and in so doing negligently expose themselves to danger from cars operated thereon within plain view of all who make proper use of their senses of sight and hearing.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1155, 1166; Dec. Dig. ⊜⟶287(9).]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by Manuel Blanco against the New Orleans Railway & Light Company. From a judgment for plaintiff, defendant appeals. Verdict and judgment appealed from annulled and set aside, and suit dismissed.

Dart, Kernan & Dart, of New Orleans, for appellant. E. M. Stafford and H. W. Robinson, both of New Orleans, for appellee.

MONROE, C. J. This is an appeal by defendant from a judgment awarding plaintiff $2,000 as damages for personal injuries sustained by him in a collision with a street car.

[1] It appears from the evidence that upon a morning in February, 1914, plaintiff, who lived on Prieur street below Canal street, and was on his way to his place of business, came up on the lake side of Prieur street with a view of taking an inbound Canal street car, and that, upon reaching the property line corner (upon which Asbury's drug store was situated), he saw such a car approaching (from the direction of the lake and moving towards the river) on the upper and farther of the two tracks which are laid on the Canal street neutral ground. It is a familiar rule that a street car will not ordinarily stop or wait for a person who stands or approaches it on the wrong side, and, as the side on which plaintiff was approaching was the wrong side from which to hail or board an inbound car, the car would probably not have stopped for him. It appears, however, that a lady stood waiting for it on the upper and right side, and that it was already slowing down, with a view of stopping and taking her up, of which circumstance plaintiff apparently concluded to avail himself, thinking, perhaps, that since the stop

had to be made for the lady, the delay thus rendered necessary would enable him to attain the proper position from which to follow her on board, or, perhaps, cherishing the idea that, even though he might be a little late, the conductor, if he should see him so near, might stretch a point in his favor and withhold the starting signal for, say, the fraction of a second. But, as no one expects a concession of that kind to a person approaching a car with an appearance of deliberation, he realized that he must accelerate his speed, and he accordingly started in a run, and, naturally enough, took something like a bee line, which led from his starting point on the lower lakeside property line corner (where the drug store stands), diagonally across the roadway forming the intersection of Canal and Prieur streets (on the lower side of Canal street), and across the neutral ground, including the outbound railroad track which is laid on the lower side thereof to the stopping place of the car on the inbound track, upper side of the neutral ground, and river side of the extended line òf Prieur street. Naturally enough, also, though to his great peril, his preoccupation in the matter of catching the inbound car excluded that consideration which the occasion required of the probability that an outbound car might be coming along on the track that he was about to cross, and, as the outbound car actually came along at that time, he and the car collided, either at the moment when he put his forward foot on the near rail of its track, or by reason of his actually running against the closed gate on the right side and near the front end of the car; our opinion, from the testimony, being that he thus ran against the gate.

Of course, the case which we thus find disclosed by the testimony is not the case presented by plaintiff's petition and which he has attempted to make out by his testimony and that of his witnesses. It would be unprofitable and tedious to analyze and criticize that testimony, and we shall do no more than refer to a few of the points which are therein involved. Plaintiff, having been called to the stand, was asked a few preliminary questions by his counsel, after which came the following:

"Q. What happened as you got to Canal street? A. I came up Prieur street from the lake side and crossed over from Asbury's direct up town, you know, and I got on the foot pavement there, and I saw an Esplanade Belt car [being the incoming car that he wanted] coming very slow, and I motioned to him, and he shook his head back to me, and as I was walking towards the river I looked towards the car, and the first thing I knew I was stunned, and that was all. Q. Do you know what part of the car struck you? A. No, sir. Q. Did you hear any bells rung? A. No, sir. Q. No alarm from that car that struck you? A. No, sir."

Dr. John Laurans, a well-known physician, called by defendant, gives the following testimony as to what he saw of the collision:

"I was walking back of town, and I just happened to see a stout gentleman run across the street, and it startled me, and I saw a car strike him, and he just sorter turned, and the crew of some car, which I think was the car coming in town, caught hold of him and led him to the sidewalk. Q. When you saw this man going across the street, what was his gait? A. Pretty fast. * * * Q. Did you observe the car at the time you saw him crossing the street? A. No, sir; his running attracted my attention, and I saw the car moving. * * * Q. Can you tell what part of the car hit him, or he hit the car? A. Yes, sir; the dashboard. Q. On what side? A. Right side of the car. * * * Q. Did you see the car on the other track at the time you saw this man crossing? A. I saw both at the same time; it startled me when I saw him running."

Nicholas Fernandez, the motorman of the car, with which the collision occurred, gave the following testimony:

"Well, reaching near Prieur street, about a car and a half from Prieur, I saw the car was coming in town, and I slowed down, but, when about 15 or 20 feet from the foot walk, I noticed a man running, looking towards the other car. Q. Then what did you do? A. I throwed my power off and started ringing my bell, the first thing, and, seeing the man rushing to get across, I reversed the car, and as I reversed the car the

car began to slide and I saw the man rushing into the gate on the side of the car. Q. What happened to the gate? A. He bent the gate in and he fell a few feet on the sidewalk, and I went and stopped a little further than the regular Canal Belt car makes, and I got off and I went to see, and I saw the man laying a few feet from the track in the street, on the river side of Prieur street."

The conductor of the car says in his testimony:

"I was up near the front end of the car collecting fares from two passengers, and I was about a quarter of the way from the front end when I heard the sound of the gong, and the motorman applied the reverse, and I looked and seen this gentleman hit and fall. The front of the car hit him. I rushed out to the front when I seen him lying down, and I tried to open the gate, but I couldn't, because he had bent all the front gate in that was on the side of the car, and I had to go out on the other side," etc.

It is shown that the car is 49 feet long and weighs 18 tons, and plaintiff's witnesses say that it was going at high speed. Nevertheless plaintiff would have the court believe that he was unable to see it from any other point save the middle of the track, immediately in front of it, because of the trees, plants, and posts which are along the side of the track between Prieur street and Roman (the latter being the next street towards the river). His cross-examination on that point reads, in part, as follows:

"Q. I am talking about from the time you leave the sidewalk at Asbury's corner, at the lower crossing, going towards the neutral ground, on the river side of Prieur street; I say, can't you see the whole length of the block from Roman to Prieur street, and see any car coming out on that track on which the Spanish Fort car is operated? A. No, sir; because there is a lot of trees and branches along there. Q. You looked to see if the car was coming that morning? A. Yes sir. * * * Q. When did you look? A. As I was on the footwalk, I throwed my head towards the river, and I steps one step and steps part of one step before I get to reach the track. Q. And that is when you looked? A. Yes, sir. Q. You were about one step from the track when you looked towards the river? A. Yes, sir. Q. That is three feet, or less than three feet? Show me a step. A. Well, say, about that far (indicating). Q. Well, that is about three feet? A. Yes, sir. Q. That is about three feet from the first rail you had

to cross? A. When I looked. Q. And you didn't see anything? A. No, sir. Q. Well, when you made the next step, you were hit? A. Yes, sir. Q. And then you didn't see anything? A. No, sir. * * * Q. And the next step you were hit? A. Well, maybe; the next step or two. Q. Didn't you tell me just now, three or four times [that] when you looked towards the river, before stepping over the rail, that you were about three feet from the rail? A. One step. Q. You still persist in that? A. I didn't see any car then. Q. You say, when you were about within one step, or three feet, from the rail, you looked towards the river? A. Yes, sir. Q. You still persist in that? A. I didn't see any car then. Q. You say, when you were about within one step, or three feet, from the rail, you looked towards the river? A. Yes, sir. Q. You still persist in that statement; that statement is true? A. Yes, sir; and I might have made another step or two and got hit. * * * Q. How do you account for the fact that, while you were making one step, to cover three feet, or making two steps, to cover six feet, that a car that you didn't see hit you? * * * A. I don't know; I figured this way, when I put my hand up for this car to stop, this Esplanade car, he was stopped, or about to stop, when I was walking across the track. I remember getting hit, and that is all, and I was throwed."

It is true that there are trees, plants, and posts along the side of the track, but there are considerable spaces between them, and, though it may be that at a certain acute angle, deflected from the line in which they stand, they may cut off the view of a moving car, we are satisfied from other testimony than that of plaintiff that such a car may be seen from points both inside and outside of that angle, and that plaintiff had ample opportunity to see it. Moreover, he had been taking and alighting from cars at that corner for ten years, and he knew that both tracks were there for the use of cars which passed frequently and at pretty high speed, and common sense required that he should look out for them. We are satisfied also that the motorman did all that could have been expected of him, from the moment that he realized that plaintiff was oblivious to the approach of his car to avert the accident. The day was dark and damp, and the track

was slippery, but he nevertheless made a reasonably good stop, with the tail of his car not more, and perhaps less, than 30 feet beyond the lake side crossing.

[2] A good deal is said about a city ordinance which reads in part:

"That, where there are two tracks on any and all streets, the electric car coming in the opposite direction of the electric car that has stopped to permit a passenger, or passengers, to get on or off the electric car, the electric car coming must stop within 30 feet of the stopped electric car long enough to permit the passenger or passengers who alight from the electric car to cross the track or tracks, if the passenger so desire."

We do not find that the ordinance has any bearing on this case, since the inbound car (with which we are here concerned) did not stop to permit a passenger to alight, and none alighted when the stop was made but it stopped in order to take on a lady who was standing in the proper place to require that service. In Jones v. N. O. Ry. & Light Co., 123 La. 1060, 49 South. 706, to which we are referred, it appeared that plaintiff had alighted from a car which he alleged had stopped in order to enable him to do so, and he was thereafter injured by a car moving in the opposite direction, upon the adjacent track. It was said in the opinion of the court:

The motorman testifies to the fact that he saw the car going down "slowing up" to permit a passenger to get out, and he should have "brought his own car to a stop in order to carry out the objects and purposes of the ordinance. The danger to the passenger, who was getting out from the passing of the upgoing car, was precisely the same whether the car from which he had alighted had come to a 'dead stop' or not."

The ordinance applies, in terms, only to the case of a car "that has stopped," and it, in terms, requires the car which approaches from the other direction to "stop within 30 feet of the stopped electric car long enough to permit the passenger or passengers who alight from the electric car to cross the track or tracks, if the passengers so desire."

In the case cited it appears that the motorman of the car that inflicted the injury knew that the other car had "slowed up" (and it was alleged that it had stopped) in order to permit a passenger to alight, and the court held that it was within the spirit and purpose of the ordinance, under those circumstances, that he should have stopped his own, which it was shown could have been done. In the instant case it is not shown that the motorman of the car that inflicted the injury knew that the other car slowed up or stopped to allow a passenger to alight, and it is not a fact that it stopped for that purpose; and, though we approve the doctrine of the cited case, we do not think it should be extended to cover a case such as the one now under consideration. In other words, though the ordinance may be so interpreted as to make it subserve the plainly declared purpose for which it was enacted, we do not think that the meaning of the language used should be broadened for the accomplishment of a purpose that was not intended. The plainly declared purpose was to protect passengers who alight from a street car on one of two tracks adjacent to each other from the danger which is constantly incurred by their passing behind the car from which they alight and being injured by a car moving in the other direction on the adjacent track, and which remains masked from their view until they find themselves immediately in front of or under it. We find nothing in the ordinance, however, which indicates any purpose to legislate for the protection of persons who approach a street car with a view to taking passage on it by crossing an intervening track, and in so doing negligently expose themselves to danger from cars operated

thereon within plain view of all who make proper use of their senses of sight and hearing. In fact, we seriously doubt whether the ordinance should be extended in its application to a case where a car merely slows up in order to enable a passenger to alight, unless it be made reasonably clear that the motorman of the other car knew that such was the purpose of the slowing up, and, after acquiring that information, was, or should have been, in a position to stop his own car, and failed to do so; for the ordinance appears to have been predicated upon the theory that cars may safely pass each other on double tracks, and provides only for the stopping of the one when the other has stopped to allow passengers to alight, the assumption being, apparently, that a passenger will not get off a car until it stops, and hence that it is only then that he needs the protection that the ordinance affords. We know, however, that passengers will, and do, get off cars before they stop, and the Jones Case properly applies the ordinance to their protection, under the circumstances there disclosed. We do not think it can avail the plaintiff now before the court.

Our conclusion then is that plaintiff brought the trouble of which he complains on himself, in that, at a moment when he was preoccupied with the impulse to catch a car upon one track, he precipitated himself against a moving car on an intervening track, or, at best, in front of it, under circumstances which precluded the possibility of averting the injury which he thereby sustained, and hence that he has no just claim against the defendant on that account.

It is therefore ordered and adjudged that the verdict and judgment appealed from be annulled and set aside, that plaintiff's demand be rejected, and that this suit be dismissed at his cost in both courts.